## THE PAUL E. THURLOW.

### No. 16732.

District Court, E. D. New York.

Oct. 22, 1943.

Mortimer M. Rothstein, of New York City (John A. Lyon, of New York City, of counsel), for libellant.

Dow & Symmers, of New York City (Sherman Petrie, Jr., of New York City, of counsel), for claimant.

CAMPBELL, District Judge.

There are two causes of action alleged in the libel herein, the first to recover for pump hire, the second to recover for services.

On November 9, 1942, for the first time, the libellant and one Arthur W. Schoultz, President of the Schaw Shipping Lines, the claimant, first met, and became acquainted, having been introduced to each other about 7 o'clock P.M. on that day, by Aro G. Gabriel, a lawyer with offices at Union City, New Jersey.

The place of meeting was at Caragol-Clark & Company's office at 80 Wall Street, New York City.

The libellant was a diver of long experience in a large way and lived at Keansburg, New Jersey.

The Schooner Paul E. Thurlow was a sunken vessel having been intentionally sunk in the Kills off Port Reading on the Staten Island side. She was 1,598 gross tons, 1,531 net, length 230 feet, breadth 41.8 feet, depth 24 feet.

The libellant was a man well known as a diver in a large way, he had done some work for Mr. Aro G. Gabriel, who had a high opinion of the libellant.

Mr. Arthur W. Schoultz, generally referred to on this trial as Captain Schoultz, had secured an option to purchase the sunken Schooner Paul E. Thurlow, and talked with Mr. Gabriel about finding a diver to go down and examine the Thurlow, and let him know her condition so as to determine whether it would be a good proposition when raised. After some effort to arrange a meeting, Mr. Gabriel was able to arrange it for the evening of November 9, 1942, when the Hansens, with their car, and Mr. Gabriel in his, went as far as Hoboken, where the Hansens left their car, and then proceeded with Mr. Gabriel in his car to 80 Wall Street, New York City, where Mr. Gabriel and Mr. Hansen went into the building at 80 Wall Street, and Mrs. Hansen stayed in Mr. Gabriel's car.

Captain Schoultz and Mr. Hansen commenced talking about the boat, and Captain Schoultz said that he wanted Mr. Hansen to go down and see just how bad the boat was damaged, and Mr. Hansen said that he would be glad to do that, and that he would do it with a helper and his own equipment, for $50 per day.

Mr. Hansen went on board the Schooner on November 11th, Armistice Day, and met Captain Schoultz there. Mr. Hansen ascertained the condition of the boat, except her bottom which was embedded in the mud, and reported favorably to Captain Schoultz.

On conflicting evidence, I find that the libellant did not enter into any contract with Captain Schoultz, or any of the companies with which he was connected, to raise the boat in any specified time, or for any speci-

fied sum, but agreed to render services for that purpose at a daily wage of $20.

Payment was made to Mr. Hansen through one of the companies with which Captain Schoultz was connected, which company also paid some claims directly, but generally by giving to Mr. Hansen each seven days a sum sufficient to pay wages and like expenses for the week.

On behalf of claimant, it was contended that Mr. Hansen was raising the boat on a flat contract sum of $4,500, and that as Mr. Hansen had no money to carry on the job, the understanding was that advances would be made to enable him to proceed, and that they would be charged against the contract price. This, in my judgment, was clearly not so, as Mr. Hansen was not an independent contractor, but only an employee.

The attempt was made by Captain Schoultz to prove that Mr. Hansen was an independent contractor by evidence of conversations, and also by the letter, Exhibit A, which it was contended was a written confirmation of the verbal agreement. This I do not believe was the fact, as I am convinced that no such letter was ever received by Mr. Hansen and the whole course of dealing was to the contrary.

That letter is dated November 7, 1942, and I have found that Captain Schoultz and Mr. Hansen met for the first time on November 9, 1942, and they could not have entered into an oral agreement before they met.

There was considerable evidence offered with reference to when the water was pumped out, and that Captain Schoultz had sent tugs down to move the boat on several occasions, but that the boat could not be moved because there was too much water in her when the tugs came. Those contentions were not sustained. The boat had been pumped before the tugs arrived, but, at that location, the Schooner at low tide rested in the mud, and the tugs came down at that stage of the tide when the water was too low to permit of their moving the Schooner.

There is a sharp conflict in the evidence between Captain Schoultz and Mr. Hansen, but in many instances Captain Schoultz was in error, and that is not surprising when you consider Captain Schoultz's business activities in being president and managing four shipping companies at one time, whereas, Mr. Hansen had no other work at the time, and certainly should, and did, have a clearer recollection of matters pertaining to the raising of the Thurlow.

The documentary evidence supports the testimony of Mr. Hansen.

Mr. Hansen was one of the employees, and I am convinced that he was discharged on January 15, 1943, and that as such employee he has been paid his wages in full. I have no doubt that Mr. Hansen was on the dock from time to time between the date of his discharge and the seizure of the vessel on January 23, 1943, but, I do not believe he was performing services for the boat, or claimant, during that time, but was watching the boat to see that his pump remained aboard. He is not entitled to recover for services having been paid in full therefor.

This brings us to a consideration of libellant's claim for pump rental.

When Mr. Hansen commenced the work of raising the Schooner, he found that more pumps were needed, and two were rented from Spinelli Construction Company of Newark, with the authority of those representing the claimant, but a much larger pump was also required, and, with the approval of Captain Schoultz, Mr. Hansen attempted to rent one, as Captain Schoultz did not desire to buy one. Mr. Hansen found that he could not rent the pump and therefore he purchased it himself, and it was agreed by Captain Schoultz on November 13, 1942, that there would be paid to Mr. Hansen $25 per day for the use of the pump.

The pump was placed aboard the Schooner Paul E. Thurlow on November 16, 1942, went into use on November 18, 1942, and remained on board up to and at the time of the seizure, and during all of that time it remained in good condition and rendered the same good service.

The pump was in use aboard the Schooner 77 days at $25 per day, making in all $1,925, upon account of which $700 has been paid, leaving due to libellant for the use of that pump $1,225, for which he is entitled to recover.

A decree should be entered in accordance with this opinion in favor of the libellant Roy R. Hansen against the Schooner Paul E. Thurlow for the sum of Twelve hundred and twenty-five dollars on the first cause of action for pump rental with interest from

January 23, 1943, and costs, and in favor of defendant dismissing the second cause of action for services, but without costs.

Settle decree on notice.